UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH WHITE,

               Plaintiff,                          Civil Action No. 12-cv-12833

        v.                                 District Judge Stephen J. Murphy, III
                                         Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13] AND
## GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16]

For about 30 years, Plaintiff Kenneth White worked at Chrysler as an assembler, repairman, and team leader. (Dkt. 8, Transcript ("Tr.") 103.) In 2005, at age 47, he was injured when "he slipped pulling an engine." (Tr. 190.) White suffers from lower-back, shoulder, and knee pain, as well as depression. These impairments led White to apply for period of disability and disability insurance benefits. The Defendant Commissioner of Social Security denied his application and White appeals. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 13, 16; *see also* Dkt. 17). For the reasons set forth below, this Court finds that substantial evidence supports the Administrative Law Judge's evaluation of the evidence and choice of residual functional capacity limitations. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 13) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 16) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

### A. Procedural History

On July 10, 2009, White applied for period of disability and disability insurance benefits asserting that he became unable to work on September 14, 2007. (Tr. 10.) The Social Security Administration initially denied White's disability application on October 29, 2009. (*Id.*) White then requested an administrative hearing, and on October 26, 2010, he appeared with counsel before Administrative Law Judge Jerome B. Blum, who considered his case *de novo*. (*See* Tr. 23-33.) In a December 15, 2010 decision, ALJ Blum found that White was not disabled. (*See* Tr. 10-19.) The ALJ's decision became the final decision of the Commissioner of Social Security on April 23, 2012 when the Social Security Administration's Appeals Council denied White's request for review. (Tr. 1.) White filed this suit on June 27, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

On appeal to this Court, White argues that the ALJ did not fully account for his various physical problems and his deficiencies in concentration, persistence, or pace. The following medical evidence relates to these two claims of error.

#### 1. Medical Evidence Prior to the Alleged Disability Onset Date

It appears that in the summer of 2005, White slipped while "pulling an engine" at work and suffered knee and back pain. (*See* Tr. 148, 190.) White's lower-back pain persisted and in November 2005, an MRI was performed on his lower back. (Tr. 257.) It showed abnormalities at three vertebral levels: a (parcentral) disc protrusion with mass affect on the thecal sac and left nerve root at L3-L4, a diffuse disc bulge, central disc protrusion, facet arthritis, and ligamentum flavum hypertrophy (i.e., spinal ligament thickening) causing central and lateral stenosis at L4-L5, and a

2

central disc protrusion without evidence of stenosis at L5-S1.  (*Id.*)[1]

In February 2006, White saw Dr. Albert Przybylski, apparently then his primary-care physician, regarding his back pain.  (Tr. 148.)  Dr. Przybylski noted that White's lumbar-spine range-of-motion was diminished due to pain.  (*Id.*)  He also noted spasm in the lumbar region.  (*Id.*)  Dr. Przybylski diagnosed recurrent lumbar strain and lumbar disc disease.  (*Id.*)  He provided a "work note."  (*Id.*)

The next month, another physician provided that White was able to return to work at Chrysler with unspecified "restrictions."  (Tr. 148.)

In May 2006, White saw Dr. Douglas Karie for left-knee pain apparently stemming from the workplace injury.  (Tr. 190.)  White reported pain when going down stairs, a popping sensation, and some catching or locking in the knee.  (*Id.*)  Dr. Karie thought that x-rays showed "minimal degenerative changes."  (*Id.*)  He diagnosed White with "patellofemoral syndrome," (i.e., damage to the cartilage under the kneecap) and a "[q]uestionable medial meniscal tear."  (*Id.*)  Dr. Karie prescribed physical therapy and a knee sleeve; he also ordered an MRI.  (*Id.*)  The MRI revealed a cartilage flap, and a scuffing irregularity of the menisci.  (Tr. 204.)

During the summer of 2006, White saw his primary-care physician on several occasions for

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae.  *See* The Cleveland Clinic, *Lumbar Canal Stenosis*, http://my.clevelandclinic.org/disorders/stenosis_spinal/hic_lumbar_canal_stenosis.aspx (last visited March 29, 2013).  The spinal cord runs through the middle of the vertebral column.  *See id.*  "At each disc level, a pair of spinal nerves exits and passes into the arms and legs."  *Id.*  Facet joints are located bilaterally at each vertebral level.  Andrew L. Chen, MD and Jeffrey M. Spivak, MD, *Degenerative Lumbar Spinal Stenosis*, 31 The Physician and Sports Medicine 8 (Aug. 2003).  "Degenerative enlargement of the facet joints may result in central impingement on the spinal canal (central stenosis) or more laterally, where the nerve root moves toward the foramen (lateral recess stenosis).  Narrowing of the neural foramen may compress the exiting nerve root (foraminal stenosis)."  *Id.*

conditions unrelated to his disability claim.  (Tr. 149-51.)  In July 2006, White underwent a physical and Dr. Przybylski noted, "[t]he patient appears[] healthy, cooperative[,] [and] in no acute distress . . . ."  (Tr. 151.)

In September 2006, White returned to Dr. Karie for a follow-up left-knee exam.  (Tr. 189.) White reported that with physical therapy, his discomfort had greatly improved and that he had only minimal discomfort.  (*Id.*)  Dr. Karie diagnosed "[p]atellofemoral syndrome, improved" and "[o]steochondral defect . . . symptomatically improved."  (Tr. 189.)

## 2.  *Medical Evidence Primarily After the Alleged Disability Onset Date*

At least by November 2006, White had returned to work at Chrysler.  (*See* Tr. 103; *see also* Tr. 27.)  He continued to work there until the alleged disability onset date of September 4, 2007. (Tr. 27.)

For about six months beginning in July 2007, White sought treatment for depression and work stress at Macomb Family Services, Inc.  (Tr. 158-64.)  White reported that he had been having problems with his supervisor and felt as though he "might snap."  (Tr. 161.)  White also reported that two of his children died in a fire in 2002.  (Tr. 161-62; *see also* Tr. 186.)  (In 2004, White's stepdaughter also died.  (Tr. 222.))  A form signed by therapists and a psychiatrist provides diagnoses of major depression, recurrent and a Global Assessment Functioning score of 50.  (Tr. 164.) A Global Assessment Functioning ("GAF") score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*" ), 30-34 (4th ed., Text Revision 2000).  A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school

functioning (e .g., no friends, unable to keep a job)." *DSM-IV* at 34.

It appears that White continued mental-health treatment at Macomb Family Services through January 2008. (Tr. 158.)  At discharge, White's symptoms had markedly decreased in frequency and severity, and he reported overall improvement in mental health and daily functioning. (*Id.*)  His Global Assessment Functioning score had risen to 70.  (*Id.*)  That score corresponds to "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV* at 34.

At the end of January 2008, White saw Dr. Cristina Fesdjian for a physical and new-patient examination.  (Tr. 186-87.)  Although White reported chronic back pain and recounted a prior hospitalization for back pain, Dr. Fesdjian's focus was more on White's high cholesterol.  (*See* Tr. 186.)

In fact, in October 2008, White returned to Dr. Fesdjian for a hyperlipidemia follow-up.  (Tr. 181.)  She noted that a recent lipid profile showed some improvement and that White had tried to improve his diet and activity.  (*Id.*)  As far as White's conditions relevant to this disability appeal, Dr. Fesdjian remarked, "He has no other complaints today except that he still has problems with his lower back an[d] [he] sometimes [has] pain and numbness in the left lower extremity."  (*Id.*)  Dr. Fesdjian's diagnoses were hyperlipidemia and "[c]hronic low back pain, stable. [Six] months followup."  (*Id.*)

In the spring of 2009, White began having right-shoulder pain.  (Tr. 180.)  In April 2009, he reported to Dr. Fesdjian that he had dislocated his right shoulder as a child, and that the recent pain may have been caused by performing upper-body exercises.  (*Id.*)  White told Dr. Fesdjian that his

5

pain was sometimes severe, including eight-out-of-ten pain at night. (*Id.*) Dr. Fesdjian thought that White likely had rotator-cuff tendinitis. (*Id.*) She ordered an x-ray, prescribed Motrin (800 mg every eight hours), and referred White for physical therapy. (*Id.*) The x-ray was unremarkable. (Tr. 194.)

In late April 2009, a physical therapist indicated that White's shoulder had caused moderate impairments in housework and overhead reaching activities and severely impaired lifting and carrying. (Tr. 171.) In May 2009, White reported that he still had moderate impairments in performing housework and overhead activities and severe impairments in lifting and carrying. (Tr. 169.) A physical therapist thought that White would benefit from continued therapy. (Tr. 170.)

In July 2009, White returned to Dr. Fesdjian. (Tr. 178.) He reported that he was still having discomfort with certain shoulder movements. (*Id.*) She noted, however, that White had "probably improved 50%." (*Id.*) White also reported that his lower-back symptoms had recently increased. (*Id.*) Dr. Fesdjian ordered a right-shoulder ultrasound and referred White to orthopedics for his shoulder and back pain. (*Id.*) The ultrasound revealed a 25% tear of the supraspinatus tendon. (Tr. 193.)

In early August 2009, White saw Dr. Melissa Nayak, apparently an orthopedist, for his right-shoulder pain. (Tr. 175-76.) He told Dr. Nayak that his shoulder pain had been ongoing for about a year, that he did not have any recent shoulder trauma, and that he woke up one day with shoulder pain. (Tr. 175.) White also stated that physical therapy had helped. (*Id.*) Dr. Nayak examined White and reviewed right-shoulder x-rays and the July 2009 ultrasound. (Tr. 176.) She found that White had "very good" strength overall, unremarkable impingement signs, but "some stiffness." (*Id.*) Her impression was "[r]ight shoulder partial-thickness supraspinatus tendon tear, early

adhesive capsulitis, improving." (*Id.*) (Adhesive capsulitis is also known as "frozen shoulder," "a condition characterized by stiffness and pain in [the] shoulder joint. Signs and symptoms typically begin gradually, worsen over time and then resolve, usually within one or two years." Mayo Clinic Staff, *Frozen Shoulder: Definition*, http://www.mayoclinic.com/health/frozen-shoulder/DS00416 (last visited Apr. 12, 2013).) Dr. Nayak's plan was to start a "targeted" physical therapy program. (*Id.*)

On August 10, 2009, White saw Kristi Rillema, apparently a physical therapist. (Tr. 166.) Under "functional limitations," Rillema's notes indicate that White had moderate impairments in housework, child or elder care, overhead reaching, and sleeping, and severe impairments in lifting and carrying and overhead reaching. (*Id.*)

Later in August 2009, White saw Dr. Joseph Farber, apparently an orthopedist, for his left-leg and back pain. (Tr. 173-74.) White reported left leg numbness and pain from his buttock down into his foot. (Tr. 173.) White said that the pain was activity related and that it worsened when sitting or standing for more than 30 minutes. (*Id.*) On exam, Dr. Farber found that White had five-out-of-five strength in his lower-extremity muscle groups. (Tr. 174.) A straight leg test was negative. (*Id.*) Dr. Farber also reviewed a lumbar MRI (apparently, an MRI taken that day (Tr. 191)), and noted degenerative disc disease but no "obvious signs of nerve root compression." He also saw "no stenosis." (*Id.*) It does appear, however, that Dr. Farber found some sensation alteration in the left foot. (*Id.*) Dr. Farber believed that White could return to work with the following limitations: no lifting in excess of ten pounds, no bending or twisting, and no prolonged standing or sitting (with the ability to change positions for comfort). (Tr. 259.) Dr. Farber opined that his restrictions were "permanent." (*Id.*)

On August 27, 2009, Gary Lonik, a non-physician "single decision maker," completed a physical residual functional capacity assessment. (Tr. 209-16.) (Under a streamlined disability determination model, a single decision maker makes the initial disability determination and the claimant can then go straight from an initial denial to an ALJ review. *See Maynard v. Astrue*, 11-12221, 2012 WL 5471150, at *6 (E.D. Mich. Nov. 9, 2012).) Lonik believed that White could perform the exertional demands of "light" work: lift 20 pounds occasionally, 10 frequently, engage in unlimited pushing or pulling, and stand or walk for six hours in an eight-hour workday. (Tr. 210.)

In September 2009, Shelly Bonanno, M.A., a limited-licensed psychologist, performed a psychological evaluation of White for Michigan's Disability Determination Service. (Tr. 221-26.) White reported a depressed mood, sleep and appetite disturbances, low motivation, and feelings of helplessness. (Tr. 222.) Bonanno noted that White did not take responsibility for his actions and would blame others. (*Id.*) She rated White's self-esteem as "fair," but provided that his insight was "poor." (Tr. 244.) White was almost perfect on the "serial sevens" test. (Tr. 225.) She diagnosed depressive disorder and assigned White a GAF score of 50. (Tr. 226.) A fully licensed psychologist co-signed Bonanno's evaluation. (Tr. 227.)

In October 2009, Dr. F. Kladder reviewed White's medical file, including Bonanno's evaluation (*see* Tr. 240), and completed a Psychiatric Review Technique form ("PRTF") for the Social Security Administration. (Tr. 228-40.) Regarding the four "B" criteria associated with the mental impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1, Dr. Kladder opined that White had "mild" restrictions in activities of daily living, "mild" difficulties in maintaining social functioning, no difficulties in concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 238.) He remarked that while White's allegations were mostly credible, his

8

allegations of problems with "concentration [were] not well supported by the findings at the [consultative examination with Bonanno]."  (Tr. 240.)

In July 2010, Dr. Asit Ray performed a rather comprehensive evaluation: he reviewed White's medical file, examined White, ordered x-rays, and reviewed x-rays and MRIs.  (*See* Tr. 244, 246.)  He then opined on White's physical limitations.  (Tr. 247-52.)  Dr. Ray believed that White had "some disc degeneration in the lumbar spine," but that there was no evidence of radiculopathy or neurologic deficits.  (Tr. 244.)  He opined that White could "continuously" lift or carry 51 to 100 pounds and sit, stand, or walk for eight hours in an eight-hour workday.  (Tr. 248.)  He also provided that White had no reaching, pushing, or pulling limitations.  (Tr. 249.)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

At the hearing before ALJ Blum, White testified primarily to physical impairments.  White explained that his pain would shoot down his left leg.  (Tr. 29.)  He explained that on his three or four bad days per week, he would lie in bed or on the floor.  (Tr. 29.)  White provided, "I can walk a few blocks when everything's okay.  I can stand for 10 to 15 minutes without pain.  And I can sit down for probably up to half an hour without having to get up with pain."  (Tr. 29.)  He also testified that he could not twist, bend over, or pick up anything heavy.  (Tr. 27.)

#### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations intended to approximate White's.  The ALJ asked the VE about job availability for a hypothetical individual of White's age (then 52), education (high school), and work experience (automotive assembler) who was capable of "light,

9

unskilled" jobs allowing for a sit-stand option. (Tr. 30-31.) The VE testified that there would be 16,000 assembler and "packager and sorter" jobs in Michigan that the hypothetical individual could perform. (Tr. 31.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age,

10

education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Blum found that White had not engaged in substantial gainful activity since the alleged disability onset date of September 14, 2007.  (Tr. 12.)  At step two, he found that White had the following severe impairments: "degenerative disc disease, arthritis and depression."  (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 12-13.)  Between steps three and four, the ALJ determined that White had the residual functional capacity to perform "light," "unskilled" work with a sit-stand option.  (Tr. 14.)  At step four, he found that White was unable to perform any past relevant work. (Tr. 18.)  At step five, the ALJ found that sufficient jobs existed in the national economy for someone of White's age, education, work experience, and residual functional capacity.  (Tr. 18.) The ALJ therefore concluded that White was not disabled as defined by the Social Security Act between the alleged onset date and the date of his decision, December 15, 2010.  (Tr. 19.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the

record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

12

## IV.  ANALYSIS

Plaintiff primarily claims that the ALJ erred in assessing his "manifold physical problems" and that substantial evidence does not support the ALJ's evaluation of the opinion evidence or his residual functional capacity assessment.  (*See* Pl.'s Mot. Summ. J. at 5-11.)  Additionally, Plaintiff raises an issue that this Court has addressed on prior occasions but hopes to further clarify: that the ALJ erred because he found that Plaintiff had "moderate" limitations in concentration, persistence, or pace, yet failed to include specific, corresponding limitations in his residual functional capacity assessment or hypothetical to the vocational expert .  (Pl.'s Mot. Summ. J. at 11-12.)  The Court considers these two claims in turn.  Neither warrants remand.

### A.  The ALJ Reasonably Evaluated the Evidence Pertaining to Plaintiff's Physical Impairments

Plaintiff's primary argument is composed of several parts.  Namely, Plaintiff says that the ALJ wrongly gave Dr. Farber's opinion "little weight" (Pl.'s Mot. Summ. J. at 9), erred in giving Dr. Ray's opinion "greater weight" (*id.* at 6-7), confused Dr. Nayak's findings with those of a physical therapist (*id.* at 7-8), and wrongly relied on an opinion by a non-physician, single decision maker (*id.* at 8-9).

Among these components, the core of Plaintiff's argument appears to be that the ALJ reversibly erred in favoring Dr. Ray's opinion over Dr. Farber's.  But nothing about Dr. Farber's opinion suggests it is more credible than Dr. Ray's.  *See* 20 C.F.R. § 404.1527(c).  Dr. Farber and Dr. Ray each performed a single physical examination of Plaintiff.  Plaintiff informed each physician of his medical history and subjective complaints.  (*Compare* Tr. 173, *with* Tr. 242.)  And they both reviewed imaging studies (with Dr. Ray ordering and reviewing new x-rays).  (*Compare* Tr. 174, *with* Tr. 244, 246.)  It is true that Dr. Farber was an orthopedist.  (*See* Tr. 173.)  But Dr. Ray's

13

speciality in physical medicine and rehabilitation (Tr. 252) was not unrelated to Plaintiff's impairments, *see* Assoc. of Am. Med. Colleges, *Specialty Information: Physical Medicine and Rehabilitation, Nature of Work*, https://www.aamc.org/students/medstudents/cim/specialties/63694/cim_pub_physmedrehab.html(last visited Apr. 11, 2013) ("Physical medicine and rehabilitation . . . is the medical specialty concerned with evaluating, diagnosing, and treating patients with physical disabilities.  These disabilities may arise from conditions affecting the musculoskeletal system such as neck and back pain, sports injuries, or other painful conditions affecting the limbs . . . .").  The ALJ was tasked with deciding whose opinion to favor, and his choice is afforded substantial deference.  *See Mullen*, 800 F.2d at 545 (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

Plaintiff resists this conclusion by pointing to objective medical evidence that allegedly runs counter to Dr. Ray's findings.  (Pl.'s Mot. Summ. J. at 6.)  Specifically, Plaintiff points to a February 2005 lumbar-spine MRI report, a May 2006 left-knee MRI report, and a July 2009 right-shoulder ultrasound report.  (*Id.*)  Plaintiff says that "[t]hese objective medical tests clearly discredit Dr. Ray's isolated opinion . . . ."  The Court disagrees.

As an initial matter, these reports, standing alone, do not evidence the type of severe abnormalities that permit a lay person, such as this Court, to say with any confidence that they undermine Dr. Ray's opinion.  To the contrary, a medical professional, Dr. Ray, gave his opinion with full knowledge that an MRI revealed a partial tear in Plaintiff's right shoulder.  (Tr. 244.)  As to the lumbar-spine and left-knee MRIs, Dr. Ray may have reviewed and accounted for those too.  (*See* Tr. 244.)  But even if he did not, they do not subvert his opinion.  The later of the two imaging

14

studies was more than a year before the alleged disability onset date. (*Compare* Tr. 10, 26, *with* Tr. 204.)   Plaintiff admits to working until September 2007, and he testified that his work was physically demanding. (Tr. 27 (providing that work required lifting over 100 pounds on occasion).) Indeed, the VE classified Plaintiff's prior work as "medium." (Tr. 30); *see also* 20 C.F.R. § 404.1567(c).   The lumbar-spine and left-knee MRI reports therefore say little about Plaintiff's residual functional capacity during the relevant time period. *See Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (6th Cir. 1999) ("Evidence relating to a time outside the insured period is only minimally probative, . . . but may be considered to the extent it illuminates a claimant's health before the expiration of his insured status." (internal citations omitted)).

Plaintiff also appears to argue that even if Dr. Ray's opinion is credible, it does not support the ALJ's residual functional capacity assessment because the opinion says Plaintiff can do much more than the assessment. (Pl.'s Mot. Summ. J. at 6.) But the ALJ did not say he was adopting Dr. Ray's opinion in totality. (Tr. 16.) He said that he was giving it "greater" weight than the other opinions of record. (*Id.*) It is apparent that the ALJ believed that if Plaintiff could do everything Dr. Ray said he could, that Plaintiff could also perform "light" work with a sit-stand option. (*See* Tr. 16.) If the facts were otherwise, the ALJ's logic might be problematic; but on this record, where there is no treating-source opinion, the ALJ's less-than-complete reliance on Dr. Ray's opinion was reasonable. *Cf. Hensley v. Astrue*, 573 F.3d 263, 266-67 (6th Cir. 2009) (finding error when ALJ crafted a limitation that fell between a treating source's limitation and a consultative examiner's limitation, reasoning that "[n]othing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion.").

Next, Plaintiff says that the ALJ erred in "disregard[ing] the opinions of Dr. Nayak" based upon a misattribution of a physical therapist's opinion. (Pl.'s Mot. Summ. J. at 7-8.) Plaintiff implies that he was prejudiced because "Dr. Nayak diagnosed a significant shoulder condition," and, since the ALJ mistakenly believed another statement by Dr. Nayak was not credible, he mistakenly discredited her diagnosis of a right shoulder partial-thickness tear and early signs of frozen shoulder. (Pl.'s Mot. Summ. J. at 7-8 (citing Tr. 175-76).)

The Court agrees with Plaintiff that the ALJ mistakenly attributed an opinion of Kristi Rillema, a physical therapist, to Dr. Nayak. (*See* Tr. 166 (Rillema's assessment); Tr. 17 (ALJ citation to Rillema's assessment).) And it is also true that the ALJ discredited Rillema's findings.

The Court disagrees, however, with the inference that Plaintiff draws from the ALJ's confusion. Nowhere does the ALJ's narrative discredit Dr. Nayak's diagnosis of a partial tear and frozen shoulder. In fact, the ALJ explicitly acknowledged that the July 2009 ultrasound "revealed a partial thickness tear of the supraspinatus tendon." (Tr. 15.) To read the ALJ's narrative in the manner Plaintiff urges would be to conclude that, despite acknowledging objective medical testing directly supporting Dr. Nayak's shoulder diagnosis, the ALJ nonetheless refused to credit that diagnosis. A more permissible inference is that the ALJ recognized that Dr. Ray accounted for Dr. Nayak's diagnosis. (*See* Tr. 244 (noting partial tear).) Indeed, the ALJ provided that Dr. Ray's opinion was consistent with the "objective medical evidence of the file." (Tr. 16.) Given that the ALJ did not explicitly discredit Dr. Nayak's diagnosis, and implicitly credited it through his discussion of the July 2009 ultrasound and reliance on Dr. Ray's opinion (which accounted for the diagnosis), Plaintiff has not shown that the ALJ's confusion about Rillema and Dr. Nayak was harmful. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("The

16

decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.").

Lastly, Plaintiff says that the ALJ erroneously relied upon the opinion of a single decision maker ("SDM") — a lay person assessment — in determining that he was not disabled.  (Pl.'s Mot. Summ. J. at 9.)  Plaintiff asserts, citing cases from this District, that "if the ALJ . . . relied upon the SDM's opinions, even impliedly, he committed reversible error."  (*Id.*; *see also* Pl.'s Resp. to Def.'s Mot. Summ. J. at 3 ("*Any* reliance upon an SDM's opinion is error . . . .").)

As lay persons, single decision makers cannot offer medical opinions, *see* 20 C.F.R. §§ 404.1513, 404.1527(a)(2), and, at least according to the Acting Chief Administrative Law Judge in 2010, they cannot even offer non-medical opinions as defined in Social Security Ruling 06-3p, *see Maynard v. Astrue*, No. 11-12221, 2012 WL 5471150, at *6 (E.D. Mich. Nov. 9, 2012).  Indeed, ALJs have been directed not to rely on single-decision-maker assessments in making their disability determination.  *See id.* ("'ALJs and AAs must not consider SDM RFC assessment forms and other findings as opinion evidence and must not evaluate them in their decisions.'" (quoting Acting Chief Administrative Law Judge, Memorandum No. 10-1691 (Sept. 14, 2010))).

But the cases Plaintiff cites do not stand for the proposition that any reliance on a single decision maker's opinion — no matter how marginal — constitutes reversible error.  In *Hensley v. Commissioner of Social Security*, the court remanded where the ALJ "gave great weight, and cited extensively" to the SDM opinion.  No. 10-11960, 2011 WL 4406359, at *1 (E.D. Mich. Sept. 22, 2011).  Further, absent the SDM opinion, there was no other opinion contradicting a treating-source opinion.  *Id.*  In *Dorrough v. Commissioner of Social Security*, the court, relying on *Hensley*, also

remanded; but there, the ALJ mistakenly believed the SDM to be a physician and assigned the

SDM's "assessment the weight befitting the opinion of a medical expert." No. 11-12447, 2012 WL

4513621, at *2 (E.D. Mich. Oct. 2, 2012). Further, the ALJ relied on the SDM opinion to make a

finding of non-equivalence at step three, and the ALJ's decision indicated that a medical opinion

was necessary to resolve the equivalence issue. *Id.* Finally, Plaintiff relies on *Maynard v. Astrue,*

which, according to the court that authored *Maynard*, was "no different than *Dorrough* and

*Hensley*." No. 11-12221, 2012 WL 5471150, at *7 (E.D. Mich. Nov. 9, 2012). In *Maynard*,

although the ALJ recognized that he was not bound by the opinion, he "relied on the [SDM's] RFC

and expressly adopted it as a state agency medical opinion." *Id.*

Here, the facts are very different than those in *Hensley*, *Dorrough*, and *Maynard*. First, the

ALJ did not mistake the SDM opinion for a medical opinion: he properly referred to Gary Lonik as

the "state consultant." (Tr. 17.) Second, the ALJ virtually rejected Lonik's opinion regardless of

medical expertise:

> The undersigned gives little weight to the state consultant Gary Lonik
> who opined that the claimant is capable of performing work at the
> light exertional level with a limited ability to reach in all directions
> (Exhibit 4F). However, the undersigned does not adopt all of the
> findings of the state consultant because there is no objective medical
> evidence to indicate that the claimant is limited in the ability to reach
> in all directions. This opinion is inconsistent with the record as a
> whole.

(Tr. 17.) Indeed, the only opinion that the ALJ credited was Dr. Ray's — he assigned all others

"little weight." (Tr. 16-17.) On this record then, the Court finds that the ALJ's reliance on the SDM

opinion, if any, was de minimis. Remand on this basis, therefore, is not necessary. *Cf. Dorrough*,

2012 WL 4513621 at *2 ("The Court is unwilling to assume that the ALJ would have decided this

issue the same way if he had correctly understood that there were no medical opinions in the record

regarding the question of medical equivalence.").

In sum, the ALJ's determination that Plaintiff's physical problems did not render him disabled is supported by substantial evidence.

**B.  The ALJ Did Not Commit Reversible Error By Finding that Plaintiff had "Moderate" Difficulties in Concentration, Persistence, or Pace, But Then Only Limiting Plaintiff to "Unskilled" Work**

At step three of the five-step disability analysis, the ALJ concluded that Plaintiff had "moderate" limitations in maintaining concentration, persistence, or pace ("CPP") (Tr. 13), i.e., that Plaintiff was moderately limited in his "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings," 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C)(3).  But, when formulating a residual functional capacity assessment and corresponding hypothetical for the vocational expert, the ALJ did not include CPP-specific limitations (e.g., "no fast-paced production work"). (Tr. 13-14, 30-31.) Rather, the ALJ merely limited Plaintiff to "unskilled work."  (Tr. 13-14, 30.)  Plaintiff says that inconsistency constitutes reversible error.  (Pl.'s Mot. Summ. J. at 11-12; *see also* Pl.'s Resp. to Def.'s Mot. Summ. J. at 3-4.)

Regarding the claim that an ALJ's residual functional capacity assessment and corresponding hypothetical do not accurately capture a claimant's "moderate" difficulties in concentration, persistence, or pace, this Court has acknowledged that merely limiting a claimant to "unskilled work" may not be sufficient because "the difficulty of a task does not always equate with the difficulty of staying on task." *Taylor v. Comm'r of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) (Michelson, M.J.) *report and recommendation adopted*, 2011 WL 2682892 (E.D. Mich. July 11, 2011) (Edmunds, J.).  Or, as well-stated by another court, "'There

19

seem[s] to be two components to having moderate problems in concentration.  One deals with the frequency of how often one cannot concentrate.  The other deals with the level of sophistication or intensity of the work that can be done with the concentration limitation.'" *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 846 (E.D. Mich. 2007) (quoting magistrate judge's report and recommendation).

Believing, however, that the ultimate question is whether substantial evidence supports the ALJ's choice of limitations in the residual functional capacity assessment and corresponding hypothetical, *see Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010); *accord Varley v. Sec'y Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987), this Court previously reasoned that "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration."  *Taylor*, 2011 WL 2682682, at *7 *report and recommendation adopted*, 2011 WL 2682892; *see also Greer v. Comm'r of Soc. Sec.*, No. 11-CV-10330, 2012 WL 1060077, at *3 (E.D. Mich. Mar. 29, 2012) ("[T]he inquiry is whether a hypothetical question that accounts for the claimant's mental impairments with only an 'unskilled work' limitation sufficiently accounts for the full extent of the claimant's mental limitations."); *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) ("To be sure, all of the ALJ's findings, including those summarized on a [Psychiatric Review Technique form ("PRTF")], must be harmonized and incorporated into the hypothetical questioning of the VE.  Yet, a particular assessment on a PRTF does not mandate a rigid checklist of restrictions that must be included in this questioning.  Rather, a case-by-case determination is required, under which the ALJ must translate the broad PRTF classifications into a set of specific limitations that are properly rooted in the administrative record."); *cf. Smith v.*

20

*Halter*, 307 F.3d 377, 378-79 (6th Cir. 2001) (holding, where ALJ made a finding that the plaintiff "often" has difficulties in CPP, that the ALJ did not need to include talismanic language in his hypothetical, at least where the evidence demonstrated that the claimant's concentrational difficulties were negligible and ALJ limited the claimant to "routine and low stress" jobs that did not involve "high quotas").

The Court recognizes that some cases suggest something of a categorical rule. These cases are, apparently, premised on the belief that a typical claimant with "moderate" limitations in concentration, persistence, or pace will be off task or behind pace even when performing "unskilled work" or "simple, routine tasks." *See Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("It is difficult to reasonably accept 'moderate' meaning anything less than 20%–30% of the time at work. Thus, 'moderate' concentration problems, even if not severe enough under the regulations to meet the listing of impairments for a finding of disability at Step 3 of the Commissioner's sequential evaluation, need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5 of that sequence. Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient."). These cases also appear to find that it would be inconsistent for an ALJ to, on the one hand, conduct an independent review of the administrative record and find that a claimant has "moderate" deficiencies in CPP, yet, on the other hand, exclude CPP-specific limitations from his RFC assessment and corresponding hypothetical.

For example, in *Allen v. Commissioner of Social Security*, for example. No. 09-13503, 2010 WL 3905983 (E.D. Mich. June 2, 2010), *report and recommendation adopted*, 2010 WL 3905194 (E.D. Mich. Sept. 30, 2010), the magistrate judge noted that the administrative record, "reviewed

in its entirety, might suggest that substantial evidence would support the conclusion that Plaintiff experienced only mild or non-existent concentrational problems." *Id.* at *5. The problem, however, was that the ALJ found that the claimant experienced moderate deficiencies in CPP. *Id.* And the ALJ "made no reference whatsoever to concentrational limitations in the hypothetical question." *Id.* Instead, the ALJ only included a limitation to "unskilled work." *Id.* at *6. Thus, the magistrate judge found that the "VE's job findings, made in response to an incomplete set of [hypothetical] limitations (by the ALJ's own account) [did] not constitute substantial evidence." *Id.* The district judge adopted the report and recommendation and similarly reasoned, "a review of the record reveals that despite the ALJ's own findings, the VE's opinion about the scope of jobs available to Allen was based on an incomplete set of limitations." *Allen*, 2010 WL 3905194, at *3 (E.D. Mich. Sept. 30, 2010); *see also Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009) (finding unpersuasive that "none of [Plaintiff's] medical or psychological treating sources suggested that Plaintiff lacked the concentration to perform unskilled one and two step work," where ALJ found that claimant had "moderate[]" CPP limitations but then only limited claimant to "simple, routine, repetitive, one or two step tasks"); *Benton*, 511 F. Supp. 2d at 846-49 (acknowledging that magistrate judge had found that "the administrative record lack[ed] objective medical findings or treatment records that would support a finding of impairment in concentration," but nonetheless remanding because (1) the ALJ found that claimant had "moderate" limitations in CPP based on claimant's medication,[2] (2) the ALJ's hypothetical only limited claimant to "simple, routine,

---

[2]In *Benton*, the claimant's attorney "provided the VE with a hypothetical claimant who is on task 75% of the time and off task 25% of the time because they are either in pain, in the back room putting their legs up, or 'goofing off.'" 511 F. Supp. 2d at 846-47. But it appears that the ALJ did not conclude that the claimant had moderate limitations in CPP for these reasons. *See id.* at 846.

repetitive work," and (3) the VE testified that many of the simple, routine jobs he had identified would not tolerate more than a 10% reduction in performance).

Notably, however, some courts have rejected the claim that an ALJ errs by omitting a CPP-specific limitation — at least where the basis for this argument is a physician's finding of "moderate" limitations in CPP, yet the same physician opines that the claimant is capable of unskilled tasks on a sustained basis. In other words, some courts have focused on the consistency of the plaintiff's argument: a plaintiff may not argue for a selective incorporation of a medical opinion to demonstrate that the ALJ erred in excluding a CPP-specific limitation.

*Lewicki v. Commissioner of Social Security* is representative. No. 09-11844, 2010 WL 3907049 (E.D. Mich. Aug. 23, 2010), *report and recommendation adopted*, 2010 WL 3905375 (E.D. Mich. Sept. 30, 2010). There, the evidence suggested that the claimant did not suffer from significant mental impairments. *Id.* at *9 (claimant told consultative psychologist that he had not had panic attacks for "a while" and that his depression was mild). But a state-agency file-review psychologist nonetheless found that the claimant had "moderate" limitations in CPP. *Id.* The same psychologist, however, "concluded that plaintiff may work better in a low stress environment, but retained the ability to do unskilled tasks on a sustained basis." *Id.* Given a record that indicated that the claimant's mental impairments were limited, and the state-agency physician's ultimate conclusion, the magistrate judge believed that substantial evidence supported the hypothetical of "simple, routine work" even though the ALJ, perhaps tracking the state-agency opinion, had found that the claimant had "moderate" limitations in CPP. *Id.* The district judge agreed: "Plaintiff's objection ignores a particularly compelling piece of evidence provided by the same state psychologist who diagnosed Plaintiff's mental limitations in the first place. The psychologist

23

diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work." *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010); *see also Sutherlin v. Comm'r of Soc. Sec.*, No. 10-10540, 2011 WL 500212, at *2-3 (E.D. Mich. Feb. 8, 2011) (finding that substantial evidence supported a hypothetical limiting the claimant to "one to two-step tasks on a sustained basis" despite ALJ's finding that the claimant had "moderate" CPP problems where state-agency physician opined that claimant's moderate CPP problems "did not interfere with his ability to perform tasks that were simple in nature" and that claimant "retained the ability to perform 'one to two' step tasks on a sustained basis."); *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) ("Having adopted Dr. Marshall's discrete finding that Plaintiff experienced moderate limitations, the ALJ also reasonably adopted Dr. Marshall's more detailed conclusion as to the Plaintiff's functional capacity for work, forming the basis for both the hypothetical question and RFC . . . .  Plaintiff's argument for the selective adoption of Dr. Marshall's 'moderate' limitations without considering his ultimate conclusion would amount to a distortion of the record."); *cf. Young v. Comm'r of Soc. Sec.*, No. 10-11329, 2011 WL 2601014, at *10 (E.D. Mich. May 23, 2011) ("Although Plaintiff correctly cites the moderate limitations[3] noted in the [state-agency] assessment, Plaintiff fails to mention that the same assessment also concluded that Plaintiff is 'capable of unskilled work.' . . .  In addition, another examiner also concluded that '[t]here is nothing presented that would socially or psychologically prevent Mr. Young from

---

[3]The state-agency physician in *Young* found that "Young was 'moderately limited' in 'the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.'"  2011 WL 2601014, at *10.

seeking, obtaining, and maintaining gainful employment.' . . .  I therefore suggest that the ALJ's hypothetical is nonetheless supported by substantial evidence."), *report and recommendation adopted*, 2011 WL 2600599 (E.D. Mich. June 30, 2011).

In sum, some cases seem to suggest that it is almost always inconsistent for an ALJ to find that a claimant has "moderate" limitations in CPP while, at the same time, excluding CPP-specific language in the residual functional capacity assessment.  *See, e.g.*, *Allen*, 2010 WL 3905983 at *5-6; *Brown*, 672 F. Supp. 2d at 797; *Green*, 2009 WL 2365557, at *10.  The underlying reasoning, apparently, is that claimants with "moderate" CPP limitations typically have difficulty staying on task or keeping pace even when performing "unskilled" or "simple, routine" work.  Other decisions have recognized that limiting a claimant to "unskilled" work or "simple, routine" tasks may be sufficient to account for the claimant's "moderate" limitations in CPP because at least some claimants with those limitations can stay on task and keep pace when the work is simple.  *See Sutherlin*, 2011 WL 500212, at *2-3; *Lewicki*,  2010 WL 3905375, at *3; *Hess*, 2008 WL 2478325, at *7-8.  In support of this theory are medical evaluations that rate a claimant's CPP limitations as moderate while nonetheless concluding that the claimant can perform unskilled work on a sustained basis.

Given the absence of a uniform, categorical rule, ALJs would greatly aid reviewing courts if they would explain why they are assigning claimants a "moderate" limitation in CPP, and — more importantly — why the mental-capacity limitations (e.g., "unskilled" work) in the residual functional capacity assessment and corresponding hypothetical fully account for that moderate rating.

Here, the ALJ's narrative is clear enough and substantial evidence supports the rationale it sets forth.

25

It is true that, taken in isolation, the ALJ's reasons for finding "moderate" limitations in concentration, persistence, or pace, when contrasted against his residual functional capacity assessment, suggest otherwise.  At step three, the ALJ noted that when Plaintiff started treatment at Macomb Family Services in July 2007, he "exhibited homicidal behaviors and homicidal ideations.  [He] was reported to be very tearful and very verbal during the discussions." (Tr. 13.) The ALJ also relied on the September 2009 findings of Bonanno (the state-agency psychologist) in rating Plaintiff's CPP difficulties as moderate: "During the consultative examination with Shelley Bonanno, M.A., the claimant's insight was noted to be poor and his emotional reaction was noted to be depressed." (Tr. 13.)  Without more, the ALJ's "moderate" rating based on his independent review of these records would suggest that remand is necessary for the ALJ to resolve the apparent inconsistency with a residual functional capacity assessment that only limits Plaintiff to "unskilled" work.

But the ALJ provided more.  First, at the end of his step-three analysis, the ALJ made clear that he intended his residual functional capacity assessment to fully account for his "moderate" CPP finding at step three:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 13.)  Then, in crafting Plaintiff's residual functional capacity assessment, the ALJ explained that

26

at discharge from Macomb Family Services in July 2008, the findings relied upon at step three no longer held: "it was noted that his symptoms for depression markedly decreased in frequency and severity." (Tr. 16.)  The Court adds that Plaintiff's GAF score at this time had risen to 70 (Tr. 158), a score that indicates only "mild" symptoms and that Plaintiff was "generally functioning pretty well," *DSM-IV* at 34.  As for Bonanno's evaluation, the ALJ highlighted the aspects that supported a limitation of "unskilled" work:

> Ms. Bonanno noted that the claimant's contact with reality appeared to be adequate and his self esteem was fair.  His stream of mental activity was spontaneous and organized and his speech was relevant and without unusual ideation.  The claimant denied hallucinations, delusions, thoughts controlled by others or unusual powers. Ms. Bonanno indicated that the claimant's prognosis was fair.

(Tr. 16.)  Further, although the ALJ did not rely on the assessment, the Court notes that Dr. Kladder, the only medical professional who rated Plaintiff's ability in concentration, persistence, or pace, found that Plaintiff had no limitations in the criteria.  (Tr. 237.)  Dr. Kladder also explained that Plaintiff was "ok on concentration with serial 7's," (an understatement given Plaintiff's single error), and that Plaintiff's "allegation of problems with concentration [were] not well supported by the findings at the [consultative exam with Bonanno]."  (Tr. 240.)

On top of this, the Court notes that "unskilled" work, by definition, is not complex.  The Social Security Rulings provide that unskilled work involves: (1) "Understanding, remembering, and carrying out simple instructions"; (2) "Making judgments that are commensurate with the functions of unskilled work—i.e., simple work-related decisions"; (3) "Responding appropriately to supervision, co-workers and usual work situations"; and (4) "Dealing with changes in a routine work setting."  S.S.R. 96-9p, 1996 WL 374185 at *9; *see also* S.S.R. 85-15, 1985 WL 56857, at *4.

In short, it is clear that the ALJ intended for his "unskilled" work limitation to fully account

27

for Plaintiff's mental impairments, including those that justified his "moderate" CPP rating. (Tr. 13 ("[T]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.").)   It is also clear that substantial evidence (including the Macomb Family Service discharge note, certain aspects of Bonnano's evaluation, and Dr. Kladder's assessment) supports the ALJ's belief that Plaintiff's mental impairments did not preclude him from performing the full range of "unskilled" work.   The Court therefore concludes that, on this record, remand is not necessary for the ALJ to add CPP-specific limitations to his residual functional capacity assessment and corresponding hypothetical to the vocational expert.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that substantial evidence supports the Administrative Law Judge's evaluation of the evidence and choice of residual functional capacity limitations.  The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 13) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 16) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  April 26, 2013

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 26, 2013.

s/Jane Johnson
Deputy Clerk