UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH WHITE

        Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

Case No. 12-cv-12833

HONORABLE STEPHEN J. MURPHY, III

**ORDER OVERRULING OBJECTIONS** (docket no. 19)**, ADOPTING
REPORT &  RECOMMENDATION** (docket no. 18)**, GRANTING THE
COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT** (docket no. 16)**,
AND DENYING WHITE'S MOTION FOR SUMMARY JUDGMENT** (docket no. 13)

     This social security appeal is before the Court for consideration of Plaintiff's objections

to the Report and Recommendation ("Report") filed by United States Magistrate Judge

Laurie J. Michelson. The magistrate judge found that the administrative law judge ("ALJ")

properly reviewed and weighed all of the evidence to determine that Kenneth White was

not disabled and that substantial evidence supports the ALJ's findings. Accordingly, she

recommends denying White's motion for judgment and granting the motion filed by the

Commissioner of Social Security ("Commissioner"). For the reasons set forth below, the

Court finds that the ALJ's decision was supported by substantial, record evidence, and that

the magistrate judge did not err in recommending its affirmance.  Accordingly, the Court will

overrule the objections, adopt the Report, deny White's motion and grant the

Commissioner's motion.

**BACKGROUND**

     White filed his application for benefits on July 10, 2009, and alleges disability as of

February 27, 2008. R. 25. White requested an administrative hearing after the denial of his

claim, which was heard by the ALJ on October 26, 2010. On December 15, 2010, the ALJ issued his finding that White is not disabled. White appealed the decision, but the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. White filed a complaint in this Court for judicial review of the Commissioner's decision. The parties filed cross-motions for summary judgment, on which the magistrate judge issued her Report.

A. White's medical history

The magistrate judge's Report provides an accurate and comprehensive recitation of White's relevant medical history, to which neither party has objected. The Court, therefore, adopts it in full and will reproduce it here, for ease of reference.

1. *Medical Evidence Prior to the Alleged Disability Onset Date*

It appears that in the summer of 2005, White slipped while "pulling an engine" at work and suffered knee and back pain. (*See* Tr. 148, 190.) White's lower-back pain persisted and in November 2005, an MRI was performed on his lower back. (Tr. 257.) It showed abnormalities at three vertebral levels: a (paracentral) disc protrusion with mass affect on the thecal sac and left nerve root at L3-L4, a diffuse disc bulge, central disc protrusion, facet arthritis, and ligamentum flavum hypertrophy (i.e., spinal ligament thickening) causing central and lateral stenosis at L4-L5, and a central disc protrusion without evidence of stenosis at L5-S1. (*Id.*)

In February 2006, White saw Dr. Albert Przybylski, apparently then his primary-care physician, regarding his back pain. (Tr. 148.) Dr. Przybylski noted that White's lumbar-spine range-of-motion was diminished due to pain. (*Id.*) He also noted spasm in the lumbar region. (*Id.*) Dr. Przybylski diagnosed recurrent lumbar strain and lumbar disc disease. (*Id.*) He provided a "work note." (*Id.*)

The next month, another physician provided that White was able to return to work at Chrysler with unspecified "restrictions." (Tr. 148.)

In May 2006, White saw Dr. Douglas Karie for left-knee pain apparently stemming from the workplace injury. (Tr. 190.) White reported pain when going down stairs, a popping sensation, and some catching or locking in the knee. (*Id.*) Dr. Karie thought that x-rays showed "minimal degenerative changes." (*Id.*) He diagnosed White with "patellofemoral syndrome," (i.e., damage to the cartilage under the kneecap) and a "[q]uestionable medial meniscal tear." (*Id.*) Dr. Karie prescribed physical therapy and a knee sleeve; he also ordered an MRI. (*Id.*)

2

The MRI revealed a cartilage flap, and a scuffing irregularity of the menisci. (Tr. 204.)

During the summer of 2006, White saw his primary-care physician on several occasions for conditions unrelated to his disability claim. (Tr. 149-51.) In July 2006, White underwent a physical and Dr. Przybylski noted, "[t]he patient appears[] healthy, cooperative[,] [and] in no acute distress . . . ." (Tr. 151.)

In September 2006, White returned to Dr. Karie for a follow-up left-knee exam. (Tr. 189.) White reported that with physical therapy, his discomfort had greatly improved and that he had only minimal discomfort. (*Id.*) Dr. Karie diagnosed "[p]atellofemoral syndrome, improved" and "[o]steochondral defect . . . symptomatically improved." (Tr. 189.)

## 2. *Medical Evidence Primarily After the Alleged Disability Onset Date*

At least by November 2006, White had returned to work at Chrysler. (See Tr. 103; *see also* Tr. 27.) He continued to work there until the alleged disability onset date of September 4, 2007. (Tr. 27.)[1]

For about six months beginning in July 2007, White sought treatment for depression and work stress at Macomb Family Services, Inc. (Tr. 158-64.) White reported that he had been having problems with his supervisor and felt as though he "might snap." (Tr. 161.) White also reported that two of his children died in a fire in 2002. (Tr. 161-62; *see also* Tr. 186.) (In 2004, White's stepdaughter also died. (Tr. 222.)) A form signed by therapists and a psychiatrist provides diagnoses of major depression, recurrent and a Global Assessment Functioning score of 50. (Tr. 164.) A Global Assessment Functioning ("GAF") score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), 30-34 (4th ed., Text Revision 2000). A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, unable to keep a job)." *DSM-IV* at 34.

It appears that White continued mental-health treatment at Macomb Family Services through January 2008. (Tr. 158.) At discharge, White's symptoms had markedly decreased in frequency and severity, and he reported overall improvement in mental health and daily functioning. (*Id.*) His Global Assessment Functioning score had risen to 70. (*Id.*) That score corresponds to "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft

---

[1]This is the date of disability White claimed in his application. He later amended it to February 27, 2008. R. 25.

within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

At the end of January 2008, White saw Dr. Cristina Fesdjian for a physical and new-patient examination. (Tr. 186-87.) Although White reported chronic back pain and recounted a prior hospitalization for back pain, Dr. Fesdjian's focus was more on White's high cholesterol. (*See* Tr. 186.)

In fact, in October 2008, White returned to Dr. Fesdjian for a hyperlipidemia follow-up. (Tr.181.) She noted that a recent lipid profile showed some improvement and that White had tried to improve his diet and activity. (*Id.*) As far as White's conditions relevant to this disability appeal, Dr. Fesdjian remarked, "He has no other complaints today except that he still has problems with his lower back an[d] [he] sometimes [has] pain and numbness in the left lower extremity." (*Id.*) Dr. Fesdjian's diagnoses were hyperlipidemia and "[c]hronic low back pain, stable. [Six] months followup." (*Id.*)

In the spring of 2009, White began having right-shoulder pain. (Tr. 180.) In April 2009, he reported to Dr. Fesdjian that he had dislocated his right shoulder as a child, and that the recent pain may have been caused by performing upper-body exercises. (*Id.*) White told Dr. Fesdjian that his pain was sometimes severe, including eight-out-of-ten pain at night. (*Id.*) Dr. Fesdjian thought that White likely had rotator-cuff tendinitis. (*Id.*) She ordered an x-ray, prescribed Motrin (800 mg every eight hours), and referred White for physical therapy. (*Id.*) The x-ray was unremarkable. (Tr. 194.)

In late April 2009, a physical therapist indicated that White's shoulder had caused moderate impairments in housework and overhead reaching activities and severely impaired lifting and carrying. (Tr. 171.) In May 2009, White reported that he still had moderate impairments in performing housework and overhead activities and severe impairments in lifting and carrying. (Tr. 169.) A physical therapist thought that White would benefit from continued therapy. (Tr. 170.)

In July 2009, White returned to Dr. Fesdjian. (Tr. 178.) He reported that he was still having discomfort with certain shoulder movements. (*Id.*) She noted, however, that White had "probably improved 50%." (*Id.*) White also reported that his lower-back symptoms had recently increased. (*Id.*) Dr. Fesdjian ordered a right-shoulder ultrasound and referred White to orthopedics for his shoulder and back pain. (*Id.*) The ultrasound revealed a 25% tear of the supraspinatus tendon. (Tr. 193.)

In early August 2009, White saw Dr. Melissa Nayak, apparently an orthopedist, for his right shoulder pain. (Tr. 175-76.) He told Dr. Nayak that his shoulder pain had been ongoing for about a year, that he did not have any recent shoulder trauma, and that he woke up one day with shoulder pain. (Tr. 175.) White also stated that physical therapy had helped. (*Id.*) Dr. Nayak examined White and reviewed right-shoulder x-rays and the July 2009 ultrasound. (Tr. 176.) She found that White had "very good" strength overall, unremarkable impingement

signs, but "some stiffness." (*Id.*) Her impression was "[r]ight shoulder partial-thickness supraspinatus tendon tear, early adhesive capsulitis, improving." (*Id.*) (Adhesive capsulitis is also known as "frozen shoulder," "a condition characterized by stiffness and pain in [the] shoulder joint. Signs and symptoms typically begin gradually, worsen over time and then resolve, usually within one or two years." Mayo Clinic Staff, *Frozen Shoulder: Definition*, http://www.mayoclinic.com/health/frozen-shoulder/DS00416 (last visited Apr. 12, 2013).) Dr. Nayak's plan was to start a "targeted" physical therapy program. (*Id.*)

On August 10, 2009, White saw Kristi Rillema, apparently a physical therapist. (Tr. 166.) Under "functional limitations," Rillema's notes indicate that White had moderate impairments in housework, child or elder care, overhead reaching, and sleeping, and severe impairments in lifting and carrying and overhead reaching. (*Id.*)

Later in August 2009, White saw Dr. Joseph Farber, apparently an orthopedist, for his left leg and back pain. (Tr. 173-74.) White reported left leg numbness and pain from his buttock down into his foot. (Tr. 173.) White said that the pain was activity related and that it worsened when sitting or standing for more than 30 minutes. (*Id.*) On exam, Dr. Farber found that White had five out-of-five strength in his lower-extremity muscle groups. (Tr. 174.) A straight leg test was negative. (*Id.*) Dr. Farber also reviewed a lumbar MRI (apparently, an MRI taken that day (Tr. 191)), and noted degenerative disc disease but no "obvious signs of nerve root compression." He also saw "no stenosis." (*Id.*) It does appear, however, that Dr. Farber found some sensation alteration in the left foot. (*Id.*) Dr. Farber believed that White could return to work with the following limitations: no lifting in excess of ten pounds, no bending or twisting, and no prolonged standing or sitting (with the ability to change positions for comfort). (Tr. 259.) Dr. Farber opined that his restrictions were "permanent." (*Id.*)

On August 27, 2009, Gary Lonik, a non-physician "single decision maker," completed a physical residual functional capacity assessment. (Tr. 209-16.) (Under a streamlined disability determination model, a single decision maker makes the initial disability determination and the claimant can then go straight from an initial denial to an ALJ review. *See Maynard v. Astrue*, 11-12221, 2012 WL 5471150, at *6 (E.D. Mich. Nov. 9, 2012).) Lonik believed that White could perform the exertional demands of "light" work: lift 20 pounds occasionally, 10 frequently, engage in unlimited pushing or pulling, and stand or walk for six hours in an eight-hour workday. (Tr. 210.)

In September 2009, Shelly Bonanno, M.A., a limited-licensed psychologist, performed a psychological evaluation of White for Michigan's Disability Determination Service. (Tr. 221-26.) White reported a depressed mood, sleep and appetite disturbances, low motivation, and feelings of helplessness. (Tr. 222.) Bonanno noted that White did not take responsibility for his actions and would blame others. (*Id.*) She rated White's self-esteem as "fair," but provided that his insight was "poor." (Tr. 244.) White was almost perfect on the "serial sevens" test. (Tr. 225.) She diagnosed depressive disorder and assigned White

a GAF score of 50. (Tr. 226.) A fully licensed psychologist co-signed Bonanno's evaluation. (Tr. 227.)

In October 2009, Dr. F. Kladder reviewed White's medical file, including Bonanno's evaluation (*see* Tr. 240), and completed a Psychiatric Review Technique form ("PRTF") for the Social Security Administration. (Tr. 228-40.) Regarding the four "B" criteria associated with the mental impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1, Dr. Kladder opined that White had "mild" restrictions in activities of daily living, "mild" difficulties in maintaining social functioning, no difficulties in concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 238.) He remarked that while White's allegations were mostly credible, his allegations of problems with "concentration [were] not well supported by the findings at the [consultative examination with Bonanno]." (Tr. 240.)

In July 2010, Dr. Asit Ray performed a rather comprehensive evaluation: he reviewed White's medical file, examined White, ordered x-rays, and reviewed x-rays and MRIs. (*See* Tr. 244, 246.) He then opined on White's physical limitations. (Tr. 247-52.) Dr. Ray believed that White had "some disc degeneration in the lumbar spine," but that there was no evidence of radiculopathy or neurologic deficits. (Tr. 244.) He opined that White could "continuously" lift or carry 51 to 100 pounds and sit, stand, or walk for eight hours in an eight-hour workday. (Tr. 248.) He also provided that White had no reaching, pushing, or pulling limitations. (Tr. 249.)

Report 2-9 (footnote omitted).

B.   The ALJ's decision

In evaluating whether a claimant is disabled under the Social Security Act, the

Commissioner follows a five-step sequence. *See* 20 CFR § 416.920.

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments, that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *3-4 (E.D. Mich. Oct. 31, 2008) (quoting 20 C.F.R. §§ 404.1520, 416.920); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that []he is precluded from performing [his] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). The Commissioner must then show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

Here, at step one, the ALJ found that White had not engaged in substantial gainful activity since the alleged onset date. At steps two and three, the ALJ found that White's claimed impairments — "degenerative disc disease, arthritis, and depression" — caused him significant limitations, but that none of White's impairments, either alone or in combination, met or equaled the criteria in Appendix I, Subpart P of 20 C.F.R. Part 404. R. 13. The ALJ then found that White has the residual functional capacity to perform "light work as defined in 20 C.F.R. 404 § 1567(b) except that he is limited to unskilled work" and "must be provided a sit/stand option." R. 13-14. The ALJ found that White's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but White's "statements concerning the intensity, persistence and limiting effects of these

7

symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 14. Accordingly, at steps four and five the ALJ determined that White is unable to perform his past relevant work as an assembler, but that there are jobs that exist in significant numbers in the national economy that White can perform. R. 18.

## STANDARD OF REVIEW

Recommendations on dispositive motions by a magistrate judge are reviewed pursuant to Civil Rule 72(b). The district judge who referred the motion is only required to perform a de novo review of the magistrate judge's findings if the parties "serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2).

This Court must affirm the ALJ's findings if they are supported by substantial evidence and the ALJ employed the proper legal standard. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence standard "presupposes that there is a zone of choice within which decisionmakers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (en banc) (internal quotes and citations omitted). Thus, when the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record might support a contrary conclusion. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir.1989). The Court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

## DISCUSSION

8

White argues that the magistrate judge erred by (1) engaging in impermissible speculation on the basis for the ALJ's decision; (2) failing to recognize that the ALJ erred by mistaking a "single decision-maker" for a doctor and by relying on the single decision-maker's opinion; (3) failing to reconcile the fact that several medical experts found that White had more severe conditions than found by Dr. Ray, the physician primarily relied on by the ALJ; and (4) impermissibly excusing the ALJ's failure to incorporate his residual functional capacity ("RFC") assessment into the hypothetical question posed to the Vocational Expert.

I.   Impermissible Speculation

White points to two instances of alleged speculation by the magistrate judge. The Court finds that neither undermines the magistrate judge's determination that the ALJ's decision was supported by substantial evidence.

First, White contends that the magistrate judge engaged in impermissible speculation to support her finding that the ALJ reasonably relied on Dr. Ray's assessment of White.

As background, in his motion for judgment, White argued that in adopting the opinion of Dr. Ray, the ALJ failed to account for the results of (1) a 2005 lumbar-spine MRI, (2) a 2006 left-knee MRI, and (3) a 2009 right-shoulder ultrasound that contradicted Dr. Ray's conclusions. Addressing the argument, the magistrate judge noted that Dr. Ray's notes showed that he had full knowledge that a 2009 MRI revealed a partial tear in White's shoulder, and then stated, "as to the lumbar-spine and left-knee MRI's, Dr. Ray *may have reviewed and accounted for those too.*" Report 14 (emphasis added). White argues that the italicized phrase demonstrates impermissible speculation. But whether or not it does, any speculation is immaterial because the magistrate judge did not rely on it to reach her conclusion. In the next sentence, the Report continues: "But even if he did not [review and

9

account for those reports too], they do not subvert his opinion," because they were both taken before the alleged onset date, and were taken during a period of time that White concedes that he was doing physically demanding work involving, for example, lifting over 100 pounds on occasion. *See* Report 14-15. Accordingly, when the magistrate judge's analysis is reviewed in context, it is evident that she did not rely on any speculation that Dr. Ray had reviewed the 2005 and 2006 MRI reports to reach her conclusion; she simply found that the reports did not undermine Dr. Ray's 2010 opinion. This Court will overrule this objection.

Second, White argues that the magistrate judge relied on impermissible speculation to conclude that the ALJ did not discredit the diagnosis of Dr. Melissa Nayak. The Court finds this allegation of speculation similarly unsupported.

As background, White noted in his motion for judgment that the ALJ had mistakenly attributed to Dr. Nayak an opinion offered by physical therapist Kristi Rillema. With respect to Dr. Nayak, the ALJ stated:

> The undersigned has also given little weight to the opinion of Melissa Nayak, M.D., who opined that the claimant would have moderate impairments with housework, childcare, overhead reaching and sleeping. She stated that the claimant would have a severe impairment with lifting and carrying and with overhead reaching [R. 166-67]. The undersigned notes that Dr. Nayak does not explain in her opinion what exact effects the claimant's impairments would have on his activities of daily living. Her opinion is inconsistent with the record as a whole and with the objective medical evidence.

R. 17. As the magistrate judge acknowledged, the opinions described in this paragraph were offered by Rillema, not Nayak. Nayak examined White on August 4, 2009. Her impression, based on her examination and review of White's July 20, 2009 shoulder ultrasound was: "[r]ight shoulder partial-thickness supraspinatus tendon-tear, early adhesive capsulitis, improving." R. 176. She further noted that White "overall has very good

strength, unremarkable impingement signs with some stiffness." R. 176. She recommended physical therapy and targeted exercises. R. 176.

In his motion for judgment, White argued that because the ALJ discredited Rillema's findings regarding White's limitations, thinking they were Dr. Nayak's, he must have also discredited Dr. Nayak's diagnosis of a partial tear and early adhesive capsulitis. The magistrate judge rejected White's argument as speculative in its own right, and unsupported in the record. She noted that elsewhere in his decision the ALJ referred specifically to the 2009 ultrasound showing the partial tear, R. 15, and that Dr. Ray's opinion also took note of the shoulder injury, R. 242, 244. The magistrate judge found it implausible that "despite acknowledging objective medical testing directly supporting Dr. Nayak's shoulder diagnosis, the ALJ nonetheless refused to credit that diagnosis." R. 16. She found, instead, that the ALJ had "implicitly credited [Dr. Nayak's] diagnosis through his discussion of the July 2009 ultrasound and reliance on Dr. Ray's opinion (which accounted for the diagnosis)." Report 16. The Court agrees with the magistrate judge's analysis and finds that the magistrate judge set forth a reasoned basis, supported in the record, for her rejection of White's inference that the ALJ's attribution error indicated that he had discredited Dr. Nayak's diagnosis. The Court will overrule this objection.

II.   <u>Single Decision-Maker</u>

Next, White objects that the magistrate judge erred (1) by failing to recognize that the ALJ improperly treated the opinion of Gary Lonik, the state's "single decision-maker", as a medical opinion and (2) for excusing the ALJ's reliance on Lonik's opinion, in any event. Neither objection has merit.

The single decision-maker model is "an experimental program offered by the Social Security Administration," designed to streamline the review of claims. *Dorrough v. Comm'r*

*of Soc. Sec.*, No. 11-12447, 2012 WL 4513621, at*1 (E.D. Mich. Oct. 2, 2012). Under the model, a "single decision-maker" ("SDM") assumes primary responsibility for processing a claimant's application for disability, including making the claimant's initial disability determination. *See* 20 C.F.R. § 404.906(a). The process is streamlined because a claimant who disagrees with the SDM's determination may skip the reconsideration level of the administrative review process, and immediately request a hearing before an ALJ. 20 C.F.R. § 404.906(b)(4).

Once the claimant's application reaches the ALJ, however, the SDM's assessment is no longer relevant to the determination of disability. Social security regulations provide that an ALJ may consider evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment, and may also consider opinions from certain "other sources" to assess "the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p; 20 C.F.R. § 404.1513. SDMs, as laypersons, are not qualified to provide medical evidence regarding a claimant's impairment. *See* 20 C.F.R. § 404.1513(a)-(c); 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources."). And agency policy provides that an SDM is also not an acceptable non-medical source. *See Maynard v. Astrue*, 11-12221, 2012 WL 5471150 (E.D. Mich. Nov. 9, 2012) ("[A]gency policy is that [SDM assessments] are also not the opinions of non-medical sources as described in SSR 06-[0]3p.") (quoting Acting Chief Law Judge Memorandum No. 10-1691 (Sept. 14, 2010)); *see also* 1 Soc. Sec. Disab. Claims Prac. & Proc. § 15:45 (2nd Ed.) ("[A]gency policy clearly states that any findings made by an SDM are not opinion evidence as they do not come from medical sources and they are not opinions of

non-physician sources as described in SSR 06-3p.").  Accordingly, under the regulations and agency policy, SDM assessments have no place in an ALJ's disability determination.

Here, the ALJ *did* discuss the SDM's opinion, as follows:

> The undersigned gives little weight to the state consultant Gary Lonik who opined that claimant is capable of performing work at the light exertional level with a limited ability to reach in all directions. However, the undersigned does not adopt all of the findings of the state consultant because there is no objective medical evidence to indicate that the claimant is limited in the ability to reach in all directions. This opinion is inconsistent with the record as a whole.

R. 17 (internal citation omitted).

White first argues that the magistrate judge erred by failing to recognize that the ALJ mistook Lonik for a doctor and relied on his opinion as though it were a medical opinion. White points to the ALJ's use of the term "state consultant" to describe Lonik, and argues that the term as used elsewhere in social security regulations describes medical or psychological consultants. But the regulation White points to as an exemplar does not use the term "consultant" in isolation; it refers to "State agency medical and psychological consultants." *See* Objections, ECF No. 19 (citing 20 C.F.R. § 404.1527). The example proves nothing about the meaning of the term "consultant" when used without the modifying phrase "medical and psychological." Accordingly, the ALJ's use of the term "state consultant" to describe Lonik does not, standing alone, suggest that the ALJ mistook Lonik for a doctor. *Compare, e.g.*, *Dorrough*, 2012 WL 4513621 at *1 (finding error where the ALJ referred to the single decisionmaker's opinion as a "*medical* opinion") (emphasis added).

And in any event, the ALJ's opinion otherwise evidences that he understood Lonik's status. When summarizing the evidence reviewed, the ALJ distinguished between the "medical treatment records" offered by physicians and "the findings and opinions of the state consultant." R. 17. Moreover, throughout the opinion, the ALJ included the credentials of each person to provide an opinion, e.g., "Asit K. Ray, M.D." and "Shelley Bonanno,

Ph.D."; he did not attribute any credentials to Lonik. Accordingly, the Court finds no basis in the ALJ decision to conclude that the ALJ mistook Lonik for a doctor. The Court overrules this claim of error.

Second, White argues that it was reversible error for the ALJ to consider Lonik's opinion at all. The Court disagrees. As discussed above, Lonik was not an acceptable source under the social security regulations and therefore his opinion was not relevant to the ALJ's disability determination, but the ALJ's discussion of his opinion in this case nonetheless does not require reversal.

The cases cited by White do not support White's contention that *any* reliance on an SDM opinion requires reversal. *See* Mot. for J. 8-9 (citing *Dorrough*, 2012 WL 4513621; *Hensley v. Comm'r of Soc. Sec.*, No. 10-11960, 2011 WL 4406359 (E.D. Mich. Sept. 22, 2011); *Maynard*, 2012 WL 5471150). In each of these cases, the court found remand necessary because the ALJ relied on the SDM opinion under the mistaken belief that the SDM was a physician. *See Dorrough*, 2012 WL 4513621, at *2 (ordering remand and stating "the Court is unwilling to assume that the ALJ would have decided this issue the same way if he had correctly understood that there were no medical opinions in the record regarding the question of medical equivalence"); *Hensley*, 2011 WL 4406359, at *1 (ordering remand where the "ALJ erroneously credited an RFC assessment as having been prepared by a physician, as opposed to the non-physician single decision maker who wrote it"); *Maynard*, 2012 WL 5471150 (ordering remand where the ALJ "relied on the RFC and expressly adopted it as a state agency medical opinion. However, the RFC did not

14

constitute a state agency medical opinion; rather, it was the opinion of non-physician single decisionmaker"). As discussed above, that error did not take place here.[2]

Second, the Court agrees with the magistrate judge's determination that the ALJ's discussion of the opinion in this case was harmless. As an initial matter, the Court notes that the ALJ relied minimally, if at all, on Lonik's opinion to determine White's RFC. The ALJ gave "little weight" to Lonik's conclusion that White could perform work at the light exertional level, and the ALJ declined to adopt at all Lonik's finding that White was limited in his ability to reach in all directions. R. 17.

Moreover, even if the ALJ minimally relied on Lonik's opinion, the error was harmless because, Lonik's opinion aside, the ALJ's RFC determination was supported by substantial evidence. *See Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 336 (6th Cir. 2007) (applying harmless error review to ALJ error). As the magistrate judge found, White did not have a "treating source" physician. *See* Report 15; *see also* 20 C.F.R. § 416.902 (defining "treating source"). Accordingly, none of the opinions in the record were entitled to controlling weight or a presumption of deference. *See Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (discussing the deference owed the opinions of treating sources). The ALJ relied most heavily on the opinion of Dr. Ray. Dr. Ray reviewed White's medical history and performed a physical examination, including taking new x-rays of White's right shoulder, hands, and lumbar spine. *See* R. 242-52. He opined that White could continuously lift and carry 51 to 100 pounds, could sit, stand, and walk without interruption in an eight-hour day,

---

[2]Courts in this district also generally agree that an SDM opinion cannot serve as the expert medical testimony required to determine whether the claimant's impairment is equivalent to a listed impairment at step three of the five-step process for determining disability. *See, e.g., McPhee v. Comm'r of Soc. Sec.*, No. 12-CV-13931, 2013 WL 3224420 (E.D. Mich. June 25, 2013) ("[T]he lack of any medical opinion on the issue of equivalence is . . . an error requiring remand."). But White does not challenge the ALJ's equivalency determination. *See* Mot. for J. 8-9.

and was unimpeded in his ability to reach, handle, push, pull, climb, balance, stoop, kneel, crouch, and crawl. As the magistrate judge noted, the ALJ had discretion to favor Dr. Ray's opinion over the opinion of other physicians in the record. *See* Report 14 (discussing the factors relevant to assigning weight to medical opinions under 20 C.F.R. § 404.1527(c)). And although the ALJ gave Dr. Ray's opinion "greater weight" than the other physicians', he declined to follow it entirely. "[I]n view of [White's] degenerative disc disease," he found White limited to light activity, even though Dr. Ray's opinion would have supported a higher level of activity. R. 16. Accordingly, the Court finds that the ALJ's discussion of Lonik's opinion does not require reversal in this case.

### III.   Failing to reconcile expert opinions

Next, White argues that the magistrate judge erred by failing to reconcile the fact that several expert opinions found that White had more severe disabilities than those found by Dr. Ray. In particular, White notes that (1) Dr. Pryzbylski diagnosed White with recurrent lumbar strain and lumbar disc disease in 2006, R. 148; (2) Dr. Karie diagnosed White with patellofemoral syndrom and an osteochondral defect of the medial femoral condyle in Sept. 2006, R. 189; (3) Dr. Farber diagnosed White with degenerative disc disease at L-3-L4, L4-L5, and L5-S1 in August 2009, R. 173-74; (4) Dr. Nayak diagnosed White with the left shoulder partial-thickness tear and early adhesive capsultis, R. 175-76; and (5) Dr. Fesdjian opined that White suffered from rotator cuff tendinitis in April 2009, R. 180. White argues that Dr. Ray's diagnosis is inconsistent with this record evidence, and therefore the ALJ's RFC, which relied heavily on Dr. Ray's diagnosis, is not supported by substantial evidence.

"[W]here the opinion of a medical source contradicts [the] RFC finding, an ALJ must explain why []he did not include its limitations in [his] determination of a claimant's RFC." *Harvey*, 2013 WL 1500688 at *8. But the evidence White points to does not contradict the

ALJ's RFC determination. First, Dr. Pyzbylski's and Dr. Karie's 2006 diagnoses precede White's date of disability and are of limited relevance. *See Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (6th Cir. 1999) ("Evidence relating to a time outside the insured period is only minimally probative." (citing *Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.1987)).

Second, as mentioned above, the ALJ *did* incorporate Dr. Farber's 2009 diagnosis of degenerative disc disease into his assessment of White's RFC. *See* R. 16.

With respect to Dr. Nayak, as discussed above, the ALJ referred specifically to the 2009 ultrasound showing the partial tear, R. 15, and Dr. Ray's opinion also took note of the shoulder injury, R. 242, 244. Moreover, considered in full, Dr. Nayak's diagnosis is not inconsistent with the ALJ's RFC. Although she diagnosed White the partial tear and frozen shoulder, she did not make any findings about his functional capacity that contradict the RFC. She noted that White had "very good strength" and unremarkable impingement" and described his frozen shoulder condition as "improving." R. 175-76. These findings are not inconsistent with the ALJ's determination that White is capable of light work.

Dr. Fesdjian's diagnosis of rotator cuff tendinitis is also not inconsistent with the RFC. White presented to Dr. Fesdjian in April 2009 with right shoulder pain, stating that he thought he might have injured his shoulder doing upper body exercises on a machine. R. 180. Fesdjian assessed him with "right shoulder pain, most likely due to rotator cuff tendinitis." *Id.* She ordered an x-ray, directed him to refrain from upper body exercises until he healed, but to otherwise engage in physical therapy. *Id.* White returned to Dr. Fesdjian in July 2009, after working with a physical therapist. R. 178. Dr. Fesdjian noted that although White was "still having discomfort with certain movements," his shoulder "ha[d] probably improved 50%." *Id.* Her examination revealed no tenderness or palpitation in his

shoulder. *Id.* His range of motion was only "somewhat limited." *Id.* He had no motor or sensory deficits. *Id.* She assessed him with "[r]ight rotator cuff tendinitis, partially improved with physical therapy" and referred him for an MRI. *Id.* The MRI results, which were the ones reviewed by Dr. Nayak and Dr. Ray, and referred to by the ALJ, showed the partial-thickness tear discussed above. Accordingly, nothing in the record suggests that Dr. Fesdjian's notes regarding rotator cuff tendinitis present a troubling inconsistency with Dr. Ray's 2010 opinion, or the ALJ's RFC.

For all the foregoing reasons, the Court will overrule this objection.

IV.   <u>Failure to Incorporate RFC into Hypothetical</u>

Finally, White argues that the magistrate judge improperly excused the ALJ's failure to sufficiently incorporate White's mental health impairments into the hypothetical posed to the vocational expert. Specifically White argues that although the ALJ found that White had "moderate limitations" as to concentration, persistence, and pace, the hypothetical posed to the vocational expert did not incorporate those limitations; rather it alluded only to White's capacity for "unskilled work." *See* R. 30-31.

Generally, the limitations found by an ALJ should be reflected in the hypothetical posed to the vocational expert. *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) ("[A]n ALJ's hypothetical questioning must 'accurately set[ ] forth the plaintiff's physical and mental impairments.' ") (quoting *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001)); *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir.1987). "An improper hypothetical question cannot serve as substantial evidence under § 405(g), and can result in a remand or reversal." *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 931 (E.D. Mich. 2005). Difficulty in concentration, persistence, and pace pertains to a claimant's "ability to sustain focused attention and concentration sufficiently long to permit the timely

and appropriate completion of tasks commonly found in work settings." 20 CFR pt. 404, subpt. P, app. 1 § 12.00(C)(3).

The hypothetical posed by the ALJ made no reference to White's moderate difficulties in sustaining focused attention, but "specific reference to timely completion of tasks" is not required whenever difficulties in concentration, persistence, or pace are found. *Bohn-Morton*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005). Such difficulties may, depending on the case, be accounted for by a restriction to "unskilled work." *See, e.g.*, *Bohn-Morton*, 389 F. Supp. 2d at 807 ("[A] particular assessment on a PRTF does not mandate a rigid checklist of restrictions that must be included in this questioning. Rather, a case-by-case determination is required, under which the ALJ must translate the broad PRTF classifications into a set of specific limitations that are properly rooted in the administrative record."). The relevant "inquiry is whether a hypothetical question that accounts for the claimant's mental impairments with only an 'unskilled work' limitation sufficiently accounts for the full extent of the claimant's mental limitations." *See Greer v. Comm'r of Soc. Sec.*, 11-CV-10330, 2012 WL 1060077 (E.D. Mich. Mar. 29, 2012). An ALJ's hypothetical question "need only include the alleged limitations of the claimant that the administrative law judge accepts as credible and that are supported by the evidence." *Delgado v. Commissioner of Soc. Sec.*, 30 F. App'x 542, 548 (6th Cir. 1993). Consistent with this, generally courts have found an "unskilled work" limitation insufficient when the ALJ's hypothetical distorts the record by construing a physician's finding of moderate limitations in concentration, persistence, and pace in a manner that is inconsistent with the physician's characterization of those limitations. *See, e.g.*, *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010) (finding reversal warranted where "the ALJ relied upon Dr.

Scher's assessment, yet the ALJ did not fairly reflect that assessment in the hypothetical because the court failed to include [Dr.] Ealy's time and speed restrictions.").

Here, the ALJ did not omit from his hypothetical any particular restrictions in concentration, persistence or pace noted by the physicians who assessed White. When finding that White had moderate limitations in concentration, persistence, and pace, the ALJ relied on 2007-08 treatment records from Macomb Family Services, Inc., *see* R. 157-164, and notes from a 2009 consultative examination with Dr. Bonanno, *see* R. 221-27. *See* R. 13. As the ALJ noted in his step-three analysis, the Macomb Family Services intake forms noted that White exhibited homicidal behaviors and ideation and was tearful and very verbal during the discussions. R. 13. The intake notes contain one finding that White appeared "distractible/inattentive," but they otherwise do not describe any specific or concrete limitation in White's ability to sustain focused attention. R. 162. Moreover, as the ALJ noted, White's 2008 Termination Summary states that his symptoms had "markedly decreased in frequency & severity," and that White showed an "[o]verall improvement in mental health status & daily functioning." R. 158. In 2009, the ALJ noted that Dr. Bonanno found that White's insight was poor and his emotional reaction was depressed. R. 13. Bonanno's notes otherwise state that White "was oriented to person, place, and time," and that his "stream of mental activity was spontaneous and organized [and] [h]is speech was relevant." R. 224. The notes make no reference to any time or speed restrictions, or difficulty sustaining focus. In addition, as the magistrate judge noted, the record also contains a Psychiatric Review Technique Form completed by Dr. Kladder. Dr. Kladder found that White had no difficulties in maintaining concentration, persistence, or pace and described White as having "intact cognition," and being "OK on concentration." R. 238, 240.

20

Accordingly, the Court finds no error in the ALJ's hypothetical, and will overrule this objection.

## CONCLUSION AND ORDER

The Court will adopt the magistrate judge's Report and affirm the ALJ's decision.

**WHEREFORE**, it is hereby ordered that White's objections (docket no. 19) are **OVERRULED** and the Report (docket no. 18) is **ADOPTED**.

**IT IS FURTHER ORDERED** that the Commissioner's motion for summary judgment (docket no. 16) is **GRANTED** and White's motion for summary judgment (docket no. 13) is **DENIED**.

**SO ORDERED**.


                              s/Stephen J. Murphy, III
                              STEPHEN J. MURPHY, III
                              United States District Judge

Dated: August 14, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 14, 2013, by electronic and/or ordinary mail.

                              Carol Cohron
                              Case Manager